**ESTATE OF Donald R. FRANTZ, Respondent,**

v.

**Gregory K. PAGE, et al., Defendants,**

**Robert W. Willwerscheid, Appellant.**

No. C8–87–2277.

Court of Appeals of Minnesota.

June 28, 1988.

Review Denied Sept. 16, 1988.

Maher J. Weinstein, Moss & Barnett, Minneapolis, for respondent.

Jerome B. Simon, Seth M. Colton, Maun, Green, Hayes, Simon, Johanneson & Brehl, St. Paul, for appellant.

Heard, considered and decided by WOZNIAK, C.J., and PARKER and FORSBERG, JJ.

## OPINION

PARKER, Judge.

Robert W. Willwerscheid appeals from the judgment holding him jointly and severally liable on a guaranty and from the denial of his motion for amended findings of fact, conclusions of law and order for judgment. Five of the six shareholders of the St. Clair Racquetball Club, Inc. (St. Clair), including Willwerscheid, executed guaranty contracts in favor of the First Grand Avenue State Bank of St. Paul to obtain a first mortgage loan for $390,000 from the bank to St. Clair. St. Clair defaulted on the loan. The estate of Donald R. Frantz paid the entire principal balance and accrued interest on the loan and received an assignment of the note, mortgage and guaranties. The estate then proceeded against the shareholders on their guaranties for the deficiency.

The trial court held four of the five guarantors jointly and severally liable for $332,402.97, the amount of the alleged deficiency. Only one of the guarantors, Willwerscheid, appealed.

We vacate the judgment because the court limited the estate's liability for contribution to 20 percent. Without evidence of the defendants' ability to respond to the judgment, the evidence was not sufficient to limit the estate's liability to 20 percent. The trial court must reopen the record to take evidence on the contribution issue.

## FACTS

On October 3, 1980, St. Clair, which operated a racquetball club, borrowed $390,000 from the bank, giving the bank a note secured by a first mortgage encumbering St. Clair's real estate.

The note was also secured by the separate guaranties of Gregory K. Page, James P. McCarthy, Gary A. Sturm, and Willwerscheid (defendants) and Donald R. Frantz.[1]

Each guaranteed payment of the note in accordance with its terms. The guaranties expressly made each jointly and severally liable to the bank and its assigns for the entire amount of the loan ($390,000) plus interest as specified in the note.

St. Clair never showed a profit, experiencing losses in all years except 1983. In the fall of 1982, shortly after Donald Frantz's death, the bank filed a claim against his estate for the entire unpaid principal and interest. The probate court allowed the claim. St. Clair, through Page, negotiated with the bank during 1983 and 1984 for various agreements and extensions of the loan, none of which were consummated. In September 1984 the bank sent a written demand to St. Clair for immediate repayment of the amount outstanding on the note plus interest. Willwerscheid informed the other shareholders and guarantors that the bank had demanded payment.

After meetings of the shareholders, the estate paid the balance of the bank's claim in the amount of $395,851.52, including principal and interest, on January 3, 1985. In return, the bank assigned to the estate, without recourse, the note, guaranties and the mortgage. In February 1985 St. Clair made $9,000 in payments on the bank note to the estate.

Sometime in early 1985, the racquetball club was put up for sale. Page listed the club through a broker for $445,000. In July or August 1985, Sturm approached Frantz about the possible exchange of a hog farm, owned by Howard Leland, for the club.

In August or September 1985, Frantz convened a meeting with the other shareholders. Sturm and Frantz told the shareholders that they could exchange the club for the hog farm. Frantz testified that he "believe[d] it was the concession of everybody that this was a way out of a huge debt [that had] been hanging over the five of [them]." Frantz threatened to lock the doors if the deal did not go through.

1. Donald Frantz died on June 10, 1982, and his estate became the owner of his shares in St. Clair. Michael Frantz, the decedent's son, became the personal representative of the estate.

Sturm testified that the shareholders told Frantz to pursue the deal.

On September 3, 1985, all the shareholders transferred their shares to the estate. Sturm and Willwerscheid admitted that the purpose of the transfer to the estate was to smooth the exchange with Leland. Page understood that the transfer would make the exchange less technically complicated.

Page and Frantz both testified that before the parties signed the transfer agreement, Page prepared a document which provided that the shareholders would "quitclaim" their shares to the estate in exchange for the estate's release or forgiveness of their guaranties. Frantz, as the estate's representative, refused to release the shareholders from liability on the guaranties. Sturm testified that although he did not participate in the conversation between Page and Frantz, he knew they were discussing some type of release for the stock at the meeting.

Page then drafted another document, which all the shareholders signed, "quitclaiming" the shareholders' shares to the estate. Appellant Willwerscheid testified that he thought everyone, including himself, was in favor of the property exchange because the club was continuing to lose money. He also testified that Frantz never told him that he would release him or any other guarantor from their guaranties and that he never demanded such a release in exchange for the transfer of shares.

Frantz and Page indicated that the shareholders also discussed the possibility of a deficiency between the amount the estate had paid on the note and the value of the farm. No agreement was reached on the possible deficiency or on the farm value at that meeting. Willwerscheid testified that Frantz told him he did not know the farm's value. According to Frantz, he told the shareholders he would not forgive the deficiency and the "general concession was we'll take our licks later, our bumps later."

On November 1, 1985, the club assets were sold to Leland in exchange for the farm and a $150,000 contract for deed. The farm had encumbrances of $311,822.55. On January 29, 1986, the farm was appraised at $220,000 (fair market value). The court, relying on these figures, calculated that the estate received net assets worth $58,177.45 in the exchange. At the time of trial a complete appraisal of St. Clair had not been done because it had been requested only shortly before trial.

The estate sued the guarantors for the difference between the net value received in the property exchange and the amount the estate paid on the note. The court found the defendants jointly and severally liable for that difference, less the estate's 20 percent liability on Donald Frantz's guaranty and less the $9,000 paid by St. Clair in 1985 (i.e. $332,402.97). Willwerscheid appeals.

## ISSUES

1. Could the estate, a coguarantor, take an assignment of the note and guaranties and elect to proceed on the guaranties rather than to sue for contribution?

2. Did the assignment materially increase the guarantors' risk and thus release them from liability on their guaranties?

3. Did the estate's forebearance to collect on the note for eight months release the guarantors from their guaranties?

4. Did the mortgage merge into the fee and discharge the debt and guaranties when the estate took title to the fee?

5. Should the trial court have credited the estate with the fair market value of St. Clair's assets in determining any deficiency?

6. Did the trial court abuse its discretion in holding the guarantors jointly and severally liable?

7. Did the trial court err in assessing interest at the rate set forth in the note, rather than at the legal rate?

8. Was the evidence sufficient for the court to limit the estate's liability for contribution to 20 percent?

## DISCUSSION

### I

■ Willwerscheid argues that the estate had only the right to sue the coguaran-

tors for contribution and could not proceed against them on their guaranties. The bank made a valid claim on the estate, which was allowed by the probate court. The estate had no choice but to pay off the note. In exchange, the bank assigned its rights under the note, mortgage and guaranties.

The guaranty contracts and the promissory note spelled out the rights of the bank and its assigns. Both instruments *expressly permitted* their assignment. The guaranties specified that an assignee had the same rights and powers under the note as did the bank and that the signers guaranteed payment of the note. These provisions gave the estate the choice, in its capacity as a creditor-assignee, to proceed on the guaranties or, in its capacity as a guarantor, to bring an action for contribution. *See also* Minn. Stat. §§ 336.3–301 (except as provided, holder of an instrument may enforce payment in the holder's own name); 336.3–416(1) (1986) ("payment guaranteed" or equivalent means signer promises that if instrument is not paid when due, signer will pay according to its tenor).

Willwerscheid also seems to argue that the estate could not proceed on the guaranties for any deficiency after the property exchange absent some express acknowledgment by the guarantors that they would remain liable. The guaranties permitted the bank's assignee to exchange or release the collateral without notice to the guarantors; they did not require the guarantors to reaffirm their intent to remain liable for any remaining indebtedness after such an exchange. We hold that the estate could enforce the guaranties.

## II

Willwerscheid argues that assignment of the note, mortgage and guaranties released the guarantors from their obligations on the guaranties because that assignment increased the guarantors' risk without their consent.

■ A material alteration in the principal contract, after execution of the guaranty contract and without the guarantor's con-

sent, discharges the guarantor if the guarantor is prejudiced by the alteration. *See Dewey v. Henry's Drive-Ins of Minnesota, Inc.*, 301 Minn. 366, 370, 222 N.W.2d 553, 555 (1974); *Schmidt v. McKenzie*, 215 Minn. 1, 9, 9 N.W.2d 1, 5 (1943). Neither the bank nor the estate materially departed from the terms of the principal contract (note). *See, e.g., Miller v. Anderson*, 394 N.W.2d 279, 284 (Minn.Ct.App.1986) (no evidence of breach of loan agreement). As Willwerscheid concedes, the note, mortgage and guaranties were assignable.

When an assignment increases the guarantor's risk beyond that to which he or she agreed, the guarantor's obligation is discharged. *See Restatement (Second) of Contracts* § 317(2)(a) (1981). Willwerscheid argues that the disposal of the collateral by an inexperienced creditor, the estate, materially increased his risk without his consent. Specifically, he contends the estate exchanged St. Clair's "real and personal property, variously valued at between $300,000 and $500,000, for a pig farm worth merely $58,000."

■ It is far from clear that exchanging the club property for the farm materially increased the guarantors' risk without their consent. Willwerscheid contends that Frantz, the estate's representative, forced the shareholder-guarantors to cooperate in the exchange by threatening to close St. Clair if they refused. Evidence that they were forced to agree to the collateral's disposal is lacking. They knew their information on the value of the properties was incomplete and did not insist that the estate release them from their guaranties; all shareholder-guarantors nevertheless agreed to transfer their shares to the estate to facilitate the exchange. Willwerscheid testified that everyone favored the property exchange because of the club's ongoing losses.

Apart from the fact that the guarantors agreed to the collateral's disposition, the evidence does not show that the exchange increased the guarantors' risk or was an imprudent trade. Frantz testified that in 1985 the club was "losing $5,000 a month

and nobody was willing to pay." During the seven or eight months of 1985 that the club was on the market, only two offers were received—the first offer, which fell through, and Leland's. Page testified that the shareholders "wanted to stop [the] hemorrhaging and the best way out [was] to sell the club."

There is no clear evidence that the club was actually worth more than the farm. An appraiser testified that the fair market value of St. Clair's real estate was $350,000 to $375,000. He admitted, however, that his appraisal was incomplete and that those figures were only estimates. Although the parties presented no evidence of any encumbrances on St. Clair's property, the outstanding indebtedness on the bank note alone may have given St. Clair a negative value. Under these circumstances, it may well have been more prudent to exchange the club for assets having a positive net value than to hang on to a money-losing business.

### III

■ Willwerscheid argues that because the estate did not seek to collect the note from St. Clair until eight months after acquiring it, the guarantors were released from their guaranties. Delay by the creditor in attempting to collect a debt from the principal does not operate to discharge the surety. A. Stearns, *The Law of Suretyship* § 6.35 (1951).

> The creditor owes no duty to the surety to be actively diligent in pursuing the principal, unless he has expressly or impliedly contracted for such an obligation or unless a statute has placed such an obligation on him after notice from the surety.

*Id.* Willwerscheid has presented no evidence of any agreement by the estate to pursue collection of the debt from St. Clair.

One reason the creditor need not pursue collection of the debt is that the surety, in this case Willwerscheid, is amply protected through "his right to pay the debt and bring his own action against the principal." *Id.* "[O]rdinarily, it is up to the surety to see to it that the principal performs his duty." *Midway National Bank v. Gustafson*, 282 Minn. 73, 79, 165 N.W.2d 218, 223 (1968). This rule is particularly appropriate when, as here, the guarantor is a shareholder of the principal, a closely owned corporation, and is in a good position to see to it that the principal performs its duty and does not breach its trust with its creditor. *See Minnesota Federal Savings & Loan Association v. Central Enterprises of Superior, Inc.*, 311 Minn. 46, 53, 247 N.W.2d 46, 51 (1976).

Willwerscheid knew the estate held the note shortly after the transaction with the bank. It appears that nothing prevented Willwerscheid from ensuring that St. Clair promptly honored its obligation to pay off the note or from paying the estate himself and bringing an action against St. Clair.

### IV

Willwerscheid argues that when the estate acquired all the shares in St. Clair, the estate

> held both fee title and the mortgage, and the mortgage thereupon merged into the fee and was extinguished. Merger also extinguished the debt and the obligation of the guarantors.

■ "An essential prerequisite of merger is that the party having both the legal and equitable interests have the intention that the interests should merge." *Lampert Yards, Inc. v. Thompson Wetterling Construction & Realty, Inc.*, 302 Minn. 83, 88, 223 N.W.2d 418, 422 (1974). The parties' intention is a question of fact. *See Geissinger v. Robins*, 274 Minn. 215, 219, 143 N.W.2d 50, 53 (1966). The law presumes that the holder of both legal and equitable estates intends to keep them separate when it is clearly in the holder's interest to keep them apart. *Long v. Mutual Trust Life Insurance Co.*, 197 Minn. 623, 625–26, 268 N.W. 195, 197 (1936).

■ Willwerscheid seems to ask this court to find that the parties intended a merger to occur. The trial court refused Willwerscheid's motion for amended findings, and the record would not support such a holding.

The transactions leading up to the transfer of St. Clair's property to the estate and subsequently to Leland show that there was no intention that a merger occur. Had the parties intended a merger, there would have been no need to discuss a possible deficiency and Page would not have proposed that the guarantors be released from their guaranties. Willwerscheid, Page and Sturm understood that the purpose of transferring their shares to the estate was to facilitate the property exchange with Leland. Frantz clearly had no intention that the estates should merge: he specifically refused to agree to release the defendants, and it would have been against the estate's interest for a merger to occur. The law presumes in such a case that the estate did not intend a merger. *See id.* at 625–26, 268 N.W. at 197. No evidence was presented to overcome this presumption.

### V

■ Willwerscheid seems to argue that the trial court erred by determining the amount of the deficiency on the note by reference to the farm's value, rather than to St. Clair's fair market value. He contends that findings of fact 17 and 18 are clearly erroneous.

Finding 17 provides:

17. [A]ll of the defendants * * * further agreed that the proceeds of the sale would be transferred to the [estate] in partial satisfaction of [the estate's] claim against the corporation and the remaining guarantors, as assignee of the bank.

There is no evidence in the record of any *explicit* agreement to this effect. However, the trial court may well have believed Frantz's testimony that he unequivocally refused to release the guarantors from their guaranties in exchange for transferring their stock to the estate. It may then reasonably have inferred that the guarantors implicitly agreed to remain liable on their guaranties by transferring their shares without reserving any rights respecting their guaranties. This finding has adequate support in the record.

Willwerscheid argues that any deficiency must be determined by crediting the estate

with the fair market value of the club at the time of the exchange. The trial court found, however,

the parties agreed that the deficiency, if any, to be owed to the [estate] would be determined at a later date, contingent upon an accurate appraisal of the farm property.

There is no evidence that the parties contemplated that a deficiency should be determined by reference to the club's value. The defendants did not seek an appraisal of the club until shortly before trial and never obtained a complete appraisal. These facts suggest they did not intend that the club's market value should be used to determine any deficiency.

The record supports the finding that any deficiency would be based on the farm's value. Frantz testified that the shareholders discussed the possibility of a deficiency at the September 3 meeting. He indicated that by a "deficiency" he meant "between the value of what Mr. Leland was paying and the amount that the estate had paid to the bank." He also testified that the shareholders agreed to an appraisal on the farm and that there would probably be three of them, but that no agreement was reached on what appraiser(s) to hire. Page testified that there was a discussion about the farm's value and that "the estate would get its appraiser and that all the stockholders would get their appraiser and there would be a shootout over land value, basically." This testimony adequately supports the court's finding.

Willwerscheid argues that not only were the court's findings erroneous, but also that the court erred under *Sprague v. Martin,* 29 Minn. 226, 230, 13 N.W. 34, 36 (1882). That case states:

[A] release by the mortgagor to the mortgagee of the equity of redemption, after condition broken, is tantamount to foreclosure, and operates as payment of the mortgage debt to the extent of the value of the property.

Under this statement, he argues, the shareholders' conveyance of their shares to the estate constituted a "foreclosure" and dis-

charged the mortgage debt to the extent of the value of St. Clair's property.

*Sprague* is inapposite. First, this statement appears to be dictum. Second, in that case the judgment creditor had redeemed property which all parties agreed had a value *in excess* of the judgment debt plus the cost of redemption. *Id.* at 234, 13 N.W. at 38. The court held that in such a case the judgment creditor's claim was completely satisfied by the redemption. *See id.* at 226, 13 N.W. at 34.

The evidence is insufficient to support a conclusion that the estate's claim was fully satisfied by the transfer of the club's assets to it. No complete appraisal was ever done of the club, and the club may have had a negative value.

### VI

■ Willwerscheid argues that the court abused its discretion in holding the guarantors jointly and severally liable on their guaranties. He contends the uncontradicted testimony of Page established that the guarantors agreed to be bound in proportion to their stock ownership.

The written guaranties specifically provide that the guarantors will be jointly and severally liable. The fact that the guaranties were executed as separate instruments makes no difference with respect to the guarantors' joint and several obligation. *See National Security Co. v. Bucklund,* 169 Minn. 177, 178–79, 210 N.W. 882, 883 (1926). The guarantors could have agreed "to share the possible burden on some basis other than that of strict proportionate contribution." *See Restatement of Security* § 146, comment a (1941). There is insufficient evidence, however, to find that such an agreement existed.

Page is the only guarantor who testified to the alleged oral agreement that the guarantors would be bound to the extent of their percentage ownership. Even then his testimony was contradictory; he told estate's counsel on cross-examination that each of the guarantors was equally liable to the bank. Additionally, any such agreement would have operated to the disadvantage of Frantz. He was the one shareholder who signed no guaranty agreement. Division of any liability on the note among all the shareholders would impose liability on Frantz which he did not assume.

■ An agreement controlling the relation of guarantors may be oral or written. *See id.* Nevertheless, had the guarantors intended to alter their obligation on the bank note, they presumably would have done so in writing. In determining their liability on a *different loan* from the estate to St. Clair, the shareholders *did* execute a proportionate guaranty.

### VII

Willwerscheid argues that

[t]he rate of interest for which co-guarantors are liable in contribution is the legal rate, not the rate carried by the note or other instrument of indebtedness. * * * The rationale for this principal is that the right of contribution is founded on the implied contract between the co-guarantors and not on the instrument of indebtedness.

He concludes that the court erred in charging interest at the rate set forth in the note, rather than at the legal rate of six percent. *See* Minn.Stat. § 334.01, subd. 1 (1986).

■ When one guarantees both the principal sum and interest, the guarantor is liable for interest at the contract rate. *See Craftique, Inc. v. Stevens & Co., Inc.,* 321 N.C. 564, 364 S.E.2d 129, 132–33 (1988).

The interest for any legal indebtedness shall be at the rate of $6 upon $100 for a year, *unless a different rate is contracted for in writing.*

Minn.Stat. § 334.01, subd. 1 (1986) (emphasis added).

By their written guaranties, the shareholders expressly contracted to be bound to the interest rate set forth in the note. Receiving an assignment of the note and guaranties, the estate, as a creditor, brought an action at law to enforce the guaranties; it did not bring an equitable action for contribution. Therefore, the language of the express contracts (guaranties) controls, and this court need not speculate

about any implied contract among the coguarantors.

We conclude, as did the trial court, that the note's terms set the interest rate under Minn.Stat. § 334.01, subd. 1. *See First National Bank of Hastings v. McNamara*, 357 N.W.2d 171, 173 (Minn.Ct.App.1984).

### VIII

■ Generally, a coguarantor is not liable for more than his pro-rata share of the debt, absent an agreement to the contrary. *Alberding v. Brunzell*, 601 F.2d 474, 478 (9th Cir.1979).

> As long as all remain solvent, available, and liable to contribution, one who pays the entire amount is entitled to recover from each of the others a sum equal to such amount divided by the number of persons participating.

*Restatement of Restitution* § 85, comment e (1937).

In their joint answer, Willwerscheid, Strum and McCarthy (jointly represented defendants) counterclaimed against the estate for contribution. There is no evidence that these defendants cross-claimed for contribution among each other or against Page. In its order for judgment, the trial court determined that all defendants were jointly and severally liable and calculated their total indebtedness to the estate upon their guaranties of the note. It then reduced the defendants' indebtedness by 20 percent, stating:

> [D]efendants collectively are entitled to a credit against the indebtedness * * * by reason of the obligation of [the estate's] decedent *to contribute* 20% to the payment of the guaranteed indebtedness to the Bank.

(Emphasis added).

We interpret this finding to mean that the court ruled on the defendants' counterclaim for contribution but limited such contribution by the estate to 20 percent. The estate concedes that the trial court ruled on the contribution issue and acknowledges that the defendants had a right to contribution.

■ In their motion for amended findings, the jointly represented defendants requested that the trial court retain jurisdiction "to reallocate the debt in the event one of the defendants is unable to pay his proportionate share of the debt." The court denied this motion.

> If one or more of a number of co-obligors or co-sureties should become insolvent or leave the jurisdiction, one of the others who makes a payment is entitled by a proceeding in equity *to have contribution from the others as if the insolvent or absent persons had originally not participated.*

*Id.* comment h (emphasis added); *Brunzell*, 601 F.2d at 478. Under this rule, we hold that the trial court erred in denying this motion and in rendering its judgment without first determining whether the defendants were able to respond to the judgment. The evidence was insufficient to limit the estate's liability in contribution to 20 percent without such a determination.

We therefore vacate that portion of the judgment holding Page, Willwerscheid, McCarthy and Sturm jointly and severally liable for $332,402.97. We further direct the court to reopen the record to take evidence on the ability of each of the guarantors to respond to the debt and then to apply the law of contribution in determining the estate's proportionate liability.

### DECISION

Affirmed in part, vacated in part and remanded.