1997 ND 238

Jerald **ALBRECHT,** Gary Bergstrom James Lewis, Lawrence Mertz, and Norman Weckerly, Plaintiffs and Appellants,

v.

James **WALTER,** Defendant and Appellee.

Civil No. 970082.

Supreme Court of North Dakota.

Dec. 10, 1997.

Daniel S. Kuntz, of Zuger Kirmis & Smith, Bismarck, for plaintiffs and appellants. Appearance by Jody Billing Bjornson.

Thomas J. Aljets, of Heinley & Aljets, Carrington, for defendant and appellee.

MARING, Acting Chief Justice.

[¶ 1] Jerald Albrecht, Gary Bergstrom, James Lewis, Lawrence Mertz, and Norman Weckerly (the investors) appealed from a judgment dismissing their action against James Walter for one-sixth of the amount they paid the United States Small Business Administration (SBA) to settle a debt. We reverse and remand.

[¶ 2] In 1985, the investors owned a vacant building on Harvey's Main Street and two adjoining lots. The property had previously been owned by the National Bank of Harvey. Lewis was the President of that bank, Bergstrom was the Vice President, and Weckerly and Mertz were directors. In 1985, the owners of Sheyenne River Enterprises, Inc., which operated "Your Pizza Palace" in Harvey, expressed an interest in selling the restaurant.

[¶ 3] The investors asked Walter, who had been managing Your Pizza Palace since 1983, if he would be interested in managing and eventually owning the restaurant. Walter agreed, and he and the investors began the process of buying the restaurant and moving it to the investors' Main Street property. The investors agreed to invest $7,000 each into the business and to borrow an additional $140,000 through a business loan to be guaranteed by the SBA. Walter did not have the financial ability to purchase stock in the business initially, but the parties agreed he would be able to buy stock from profits of the business and he would eventually own it.

[¶ 4] On December 15, 1985, Lewis and Bergstrom executed an application for a business loan guaranteed by the SBA on behalf of Sheyenne River Enterprises, Inc. Schedule II of the application indicated Walter was the manager and owned 1.96 percent of the stock.[1] It also indicated "James Walters will be purchasing stock as he has funds available and from Manager's Bonus." Schedule III showed the following costs and use of loan proceeds:

A. Total Cost for Purchase and Relocation.

| | |
|---|---|
| Purchase Existing Business | $ 42,000.00 |
| Purchase Business Inventory | 9,000.00 |
| Purchase Building | 66,500.00 |
| Remodel Expenses | 27,000.00 |
| New Equipment | 10,500.00 |
| Purchase 2 Adjacent Lots | 20,000.00 |
| Total Investment | $175,000.00 |

*Includes approximately $16,000 of blue sky considering the market value of the equipment.

---

1. Walter, however, did not buy any stock.

B. Source of Funds:

| | |
|---|---|
| Capital Injection | $ 35,000.00 |
| SBA Loan Proceeds | 140,000.00 |
| | $175,000.00 |

Walter helped prepare and signed Exhibit C in the application, showing projected sales, expenses, and net income through June 30, 1987. Exhibit D in the SBA application stated, in part:

The business was started as a pizza shop in about August of 1977....

James Walter became manager of the business in September of 1983 and the business has expanded its menu and now serves breakfasts, as well as the dinner and supper meals.

\* \* \* \* \* \*

The manager, James Walter, will also have an opportunity to purchase an interest in the business and to purchase additional interest from profit sharing.

Exhibit E stated, in part:

James Walter, Sr.—High school graduate and has been working in restaurants for about 13 years. Has 8 years of management experience in the food service business. Has been with the Pizza Palace for the past 2½ years. The Pizza Palace has shown an annual growth in sales of about 25%.

[¶ 5] The restaurant was moved to the investors' Main Street property in January 1986. At that time the restaurant "made a complete menu and went to a food service dining area." On February 18, 1986, Walter signed, as Treasurer, a resolution authorizing the company to execute a promissory note, and any other required instruments. Walter and the investors each signed an SBA Guaranty on February 18, 1986, guaranteeing to the "Lender, its successors and assigns, the due and punctual payment ... of the principal of and interest on" the $140,000 promissory note of Sheyenne River Enterprises, Inc.

[¶ 6] Although Walter managed the investors' restaurant until May 23, 1988,[2] he nev-

---

2. Job Service North Dakota found Walter voluntarily quit his job. The trial court found the investors fired Walter without cause.

er received any stock in the corporation. Considering depreciation write-offs, the corporation never showed a profit while Walter managed the restaurant. About four months after he left his position as manager of the investors' restaurant, Walter opened a new restaurant in Harvey with about the same menu as the investors' restaurant.

[¶ 7] After Walter left, the investors operated the restaurant for a short time with the help of the restaurant's employees. Lewis and his family then bought the business. They injected $25,000, issued checks to the other investors for $4,500 each and gave each of the other investors a note for $2,500. The first year the Lewis family operated the restaurant, sales dropped by $84,000. The Lewis family injected an additional $67,000 into the business and received and repaid a federal disaster loan for $29,200. The Lewis family closed the restaurant in 1995.

[¶ 8] The restaurant's assets were sold and the net proceeds were applied to the SBA indebtedness, leaving a principal balance due the SBA of $60,648.57, plus approximately $15,000 in interest. The SBA accepted a proposal for payment of the principal balance and forgiveness of the interest. Walter refused to pay any portion of the debt to the SBA. The investors paid the balance owed to the SBA. The SBA assigned to the investors its right, title, and interest in the note and in the individual guaranties executed by Walter and the investors.

[¶ 9] The investors sued Walter for $10,-108.10, alleging they were entitled to judgment "pursuant to the terms of the guarantee executed by" Walter which had been assigned to them, or "for equitable contribution equal to [Walter's] pro rata share of the amount paid for the assignment of the Note and Guarantees."

■■■ [¶ 10] Generally, "guarantors who pay more than their proportionate share of an obligation are entitled to contribution from other guarantors who are jointly and severally liable for the contribution." *Citizens State Bank v. Bossard*, 226 Mont. 75, 733 P.2d 1296, 1298 (1987); *see* N.D.C.C. § 9–01–08. A guarantor may compel contribution by a coguarantor by an action at law or in equity. 38 Am.Jur.2d, *Guaranty* § 129

(1968). A paying coguarantor may be denied contribution for the wrongful nature of his conduct or for fraudulently inducing another to become a co-obligor. 18 Am.Jur.2d, *Contribution* §§ 97, 98 (1985).

[¶ 11] Some courts have held a guarantor may pay off an obligation, take an assignment of guaranty contracts and the promissory note, and enforce a co-guarantor's guaranty. *See, e.g., Estate of Frantz v. Page*, 426 N.W.2d 894, 898 (Minn.App.1988) (a guarantor's estate, which paid a note and was assigned the note and guaranties, had "the choice, in its capacity as a creditor-assignee, to proceed directly on the guaranties or, in its capacity as a guarantor, to bring an action for contribution."). "The assignment of an instrument vests in the transferee the same rights the transferrer had therein." *Industrial Indem. Co. v. Anderson*, 697 F.Supp. 1532, 1535 (D.N.D.1988). However, a paying guarantor taking an assignment may not recover from his co-guarantors more than their proportionate shares of the amount paid. *Mandolfo v. Chudy*, 5 Neb.App. 792, 564 N.W.2d 266 (1997).

[¶ 12] Other courts have held a paying guarantor may not sue on the note, but is limited to contribution. *See, e.g., Koeniger v. Lentz*, 462 So.2d 228, 228–29 (La.App.1984) (A guarantor who "in large part paid the principal debts" and "was conventionally subrogated to all rights of the creditor bank … may not sue on the notes, and [ ] his rights against his co-guarantors are governed by the rules of suretyship.").

[¶ 13] In *Mandolfo v. Chudy*, 5 Neb.App. 792, 564 N.W.2d 266 (1997), the coguarantor received an assignment of a promissory note and its guaranties. The coguarantor claimed he could recover the entire principal sum and accrued interest from one of the other coguarantors. The Nebraska Court of Appeals held the doctrine of equitable contribution limits the coguarantor's recovery. *Id.* Citing prior Nebraska law the court stated: " 'A … co-obligor … is entitled to no more by way of contribution than will put him on an equality of loss with others in view of his share of the obligation undertaken. This is true even though he obtains an assignment

from the creditor....'" *Id.,* 564 N.W.2d at 271, *quoting Exchange Elevator Company v. Marshall,* 147 Neb. 48, 22 N.W.2d 403, 410–11 (1946). The Nebraska court looked to the jurisprudence of other states to analyze the issue and reviewed *Estate of Frantz v. Page,* 426 N.W.2d 894 (Minn.App.1988); *Koeniger v. Lentz,* 462 So.2d 228 (La.App.1984); *Weitz v. Marram,* 34 Md.App. 115, 366 A.2d 86 (1976) and *Curtis v. Cichon,* 462 So.2d 104 (Fla.App.1985) and concluded the relationship between the parties as coguarantors operated as a matter of law to restrict the coguarantor's recovery from the other coguarantor, in the absence of insolvent coguarantors, to no more than the pro rata share of the obligation owed.

[¶ 14] We find this analysis persuasive and conclude a coguarantor may purchase an assignment of a note and the guaranties, but the initial relationship as coguarantors will operate as a matter of law to restrict the recovery and will govern the rights of the coguarantors. Accordingly, all of the defenses to an action for contribution are available to the coguarantor in this action.

[¶ 15] Walter raised fraudulent inducement as a defense to the claim on the assigned guaranty. The trial court determined among other things:

> [Walter's] agreement to sign the guarantee was fraudulently induced by the plaintiffs. [Walter's] guarantee, as well as the implied agreement of contribution, are therefore void and unenforceable.

The trial court also determined the investors "are barred from seeking contribution from the defendant because of their wrongful conduct in mismanaging the debtor corporation;" the investors "took unfair advantage of" Walter; the investors' "wrongful actions constituted a breach of contract;" and the investors "would be unjustly enriched if they were to receive contribution from the defendant."

[¶ 16] Under Rule 52(a), N.D.R.Civ. P., the trial court's findings of fact will not be set aside unless they are clearly erroneous. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, on

reviewing the entire evidence, this court is left with a definite and firm conviction a mistake has been made. *Dickson v. Dickson,* 1997 ND 167, ¶ 14, 568 N.W.2d 284.

[¶ 17] Actual fraud requires the suggestion or assertion "of that which is not true," "suppression of that which is true," "[a] promise made without any intention of performing it," or some "other act fitted to deceive." N.D.C.C. § 9–03–08. Constructive fraud requires that one breach a duty which gains an advantage by "misleading another to his prejudice." N.D.C.C. § 9–03–09. Thus, fraud requires misrepresentation of facts, suppression of facts, misleading another, or promising without intending to perform. "Fraud is never presumed, but must be proved by evidence that is clear and convincing." *Kary v. Prudential Ins. Co.,* 541 N.W.2d 703, 705 (N.D.1996).

[¶ 18] The trial court's finding that Walter's "agreement to sign the guarantee was fraudulently induced" by the investors, was based upon the following underlying findings of fact:

3.

To induce Walter to sign the guarantee of the plaintiffs' corporation's indebtedness, the plaintiffs promised Walter that he would be hired to manage the restaurant and have the ability to purchase stock to a point of a controlling stock position in Sheyenne River....

4.

The plaintiffs knew or should have known that under the circumstances of the business practices in Harvey, Walter would never gain controlling stock in the corporation or ever be in a position to gain any stock....

5.

Sheyenne River Enterprises purchased an empty building and two empty lots in Harvey. They changed the location and the nature of the restaurant. The nature of the business was changed from a fast food pizza restaurant into a full service, full menu restaurant.

[¶ 19] The corporation's SBA application was executed by Lewis and Bergstrom on December 15, 1985. Exhibit D of the application states: "James Walter became manager of the business in September of 1983 and the business has expanded its menu and now serves breakfasts, as well as the dinner and supper meals." Walter testified: "And when we moved onto Main Street the whole idea was to attract all the people from in town that go out to eat lunch, and we made a complete menu and went to a food service dining area." Thus, the decision to expand the menu was made before Walter signed his guaranty. Before signing the guaranty, Walter, like the investors, knew or should have known the corporation was borrowing $140,000; the corporation was moving the restaurant to the Main Street property owned by the investors; the corporation was going to pay the investors $66,500 for the Main Street building and $20,000 for two adjoining lots; the menu had been expanded; and that the restaurant would continue to recognize depreciation, as it had in the past.

[¶ 20] Walter knew or should have known as much about the business venture as the investors did. There is no evidence the investors misrepresented any facts, suppressed any facts, misled Walter, or made any promises they did not intend to perform. There is no evidence the investors fraudulently induced Walter to sign the SBA guaranty. The trial court's finding that Walter's "agreement to sign the guarantee was fraudulently induced" is, therefore, clearly erroneous.

[¶ 21] The trial court's determinations that the investors are barred from contribution because of wrongful conduct, unfair advantage, and unjust enrichment were based upon the following underlying findings of fact not already set forth:

### 6.

In 1988, Walter saw an unfilled need in the Harvey food delivery market. Walter desired to open a fast food restaurant adjacent to the highway. Walter believed he could run the fast food restaurant as a sideline on his own time and felt such a business would not compete with Sheyenne River's restaurant. Walter applied for a loan at the National Bank of Harvey to establish such a business. Not only was the loan rejected but the plaintiffs summarily fired Walter from his position at Sheyenne River. The plaintiffs fired Walter for no cause or bad cause. The plaintiffs did not have good cause to fire Walter.

### 7.

After Walter was fired, Sheyenne River's restaurant was run by various of plaintiff Lewis' children until it closed in mid 1995. It is apparent that, under the control of plaintiff Lewis and his family, Sheyenne River's restaurant was badly managed. No real estate taxes from and after 1990 were paid and the SBA guaranteed loan was defaulted and assigned to SBA on November 3, 1993.

\* \* \* \* \* \*

### 9.

The plaintiffs mismanaged the debtor corporation, diverted the collateral securing the SBA indebtedness, and siphoned off assets of the debtor thereby increasing Walter's risk beyond what he agreed. The plaintiffs' conduct caused the default of the corporation on the SBA guaranteed note. The bargaining powers between the parties was unequal with the plaintiffs holding a substantial amount of bargaining power and Walter holding virtually no power in bargaining. The plaintiffs wilfully changed the nature of the pizza restaurant business to a full service, full menu restaurant without the advice or counsel of Walter with regards to his agreement to guarantee the SBA loan for a pizza restaurant managed by himself. Walter played no part in these business decisions.

[¶ 22] The evidence shows the investors and Walter had a difference in business judgment about the desirability of another restaurant in Harvey; after Walter left the restaurant, Lewis and his family purchased it, injecting $25,000, issuing $4,500 checks and $2,500 notes to other investors; the first year the Lewis family operated the restaurant, sales dropped by $84,000; the Lewis family injected an additional $67,000 into the busi-

ness and received and repaid a federal disaster loan for $29,200; the Lewis family closed the restaurant in 1995; when the investors sold their stock to Lewis and his family in 1988, the corporation paid Albrecht $6,000 for demolition of buildings, paid Bergstrom $1,000 for accounting services, paid Lewis $1,000 for accounting services, and paid Weckerly $1,000 for use of a loader; when the restaurant's assets were sold, the investors used some of the proceeds to pay sale expenses, taxes, and utilities; Walter had restaurant management experience the investors lacked and if Walter had not signed the SBA guaranty, the investors "probably wouldn't have gone forward with the SBA loan, because we had no expertise;" and the menu was changed before Walter signed the SBA guaranty. While the evidence shows a difference in business judgment about the desirability of another restaurant in Harvey, a large drop in sales after Walter opened his competing restaurant, and the restaurant failed despite large capital injections by the Lewis family, the evidence does not show that the restaurant was badly managed, does not show wrongful conduct by the investors, and does not show the investors took unfair advantage of Walter. Our review of all the evidence has left us with a definite and firm conviction a mistake has been made in finding wrongful conduct and unfair advantage. Those findings are, therefore, clearly erroneous.

 [¶ 23] A determination of unjust enrichment is a conclusion of law, *Matter of Estate of Zent,* 459 N.W.2d 795, 798 (N.D. 1990), and is fully reviewable by this court, *Opp v. Matzke,* 1997 ND 32, ¶ 8, 559 N.W.2d 837. There are five elements necessary to proving unjust enrichment: " '1. An enrichment; 2. An impoverishment; 3. A connection between the enrichment and the impoverishment; 4. Absence of a justification for the enrichment and impoverishment; and 5. An absence of a remedy provided by law.' " *Opp v. Matzke,* ¶ 8, *quoting A & A Metal Bldgs. v. I–S, Inc.,* 274 N.W.2d 183, 189 (N.D.1978). A determination of unjust enrichment "holds that a certain state of facts is contrary to equity." *Zent,* 459 N.W.2d at 798. While contribution by Walter would cause an enrichment and an impoverishment

by reducing the investor's losses and making Walter pay his proportionate share of the loss, there is a justification for the enrichment and the impoverishment. Walter agreed to be responsible for the corporation's debt and executed a guaranty. Walter was a coguarantor, with the investors, of the corporation's SBA-guaranteed debt. We conclude contribution by Walter would not be "contrary to equity," *Zent,* 459 N.W.2d at 798, and would, therefore, not unjustly enrich the investors.

[¶ 24] The judgment is reversed and the matter is remanded for entry of a judgment for the investors against Walter for his proportionate share of the debt paid by the investors.

[¶ 25] NEUMANN and SANDSTROM, JJ., GERALD G. GLASER, Surrogate Judge, and RALPH R. ERICKSON, District Judge, concur.

[¶ 26] RALPH R. ERICKSON, District Judge, and GERALD G. GLASER, Surrogate Judge, sitting in place of VANDE WALLE, C.J., and MESCHKE, J., disqualified.

