Argued and submitted May 6, 2013; resubmitted en banc June 3, reversed and remanded October 15, 2014

STERLING SAVINGS BANK,
by and through,
Northwest Lending Partners, LLC, Assignee,
*Plaintiff-Appellant,*

*v.*

EMERALD DEVELOPMENT CO,
an Oregon corporation;
Lily Mirtorabi; Jason Hossein Samani;
Javad John Mirtorabi; Mehdi Mirtorabi;
and Habib Matin,
*Defendants-Respondents,*

*and*

MERIDIAN VILLAGE NO. 1, LLC,
an Oregon limited liability company; et al,
*Defendants.*

Washington County Circuit Court
C094420CV; A150048

338 P3d 719

Michael D. Montag, argued the cause for appellant. With him on the briefs were A. Richard Vial and Vial Fotheringham LLP.

Andrew T. Reilly argued the cause for respondents. With him on the brief was Black Helterline LLP.

Before Haselton, Chief Judge, and Armstrong, Wollheim, Ortega, Sercombe, Duncan, Nakamoto, Hadlock, Egan, DeVore, Lagesen, and Tookey, Judges, and Schuman, Senior Judge.

NAKAMOTO, J.

Duncan, J., dissenting.

**NAKAMOTO, J.**

During litigation of this collection action brought by plaintiff Sterling Savings Bank (Sterling) against the principal obligor and coguarantors of a promissory note, Northwest Lending Partners, LLC (Northwest) purchased the note and the guaranty agreements from Sterling. In conjunction with the purchase, Sterling settled with some of the coguarantors; subsequently, the trial court entered a limited judgment on the debt and a supplemental judgment awarding Sterling its attorney fees against the principal obligor and the remaining, nonsettling coguarantors. As proceedings to enforce the judgments were underway, however, the remaining coguarantors sought and obtained relief from the judgments under ORCP 71 B(1)(e).

Standing in Sterling's shoes,[1] Northwest assigns error to (1) the trial court's decision to grant the nonsettling guarantors' motion for relief from the limited and supplemental judgments under ORCP 71 B(1)(e) and (2) the court's consequent entry of a general judgment vacating those judgments as against the nonsettling guarantors and dismissing with prejudice all claims against them. We conclude that the trial court erroneously concluded that the note and judgments had "been satisfied, released, or discharged" when Northwest purchased the promissory note from Sterling and, therefore, that the trial court erred by granting the motion for relief from the judgments under ORCP 71 B(1)(e) and by entering the general judgment. Accordingly, we reverse and remand for further proceedings.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

We begin by summarizing the facts, most of which are procedural and undisputed. To the extent that there were relevant factual disputes before the trial court, we note the trial court's express findings, if any, and discuss any implicit findings necessary for the trial court's legal conclusions and the evidence relevant to such facts.

---

[1] By our order, appellant of record in this case is Sterling Savings Bank, by and through Northwest Lending Partners, LLC. Throughout this opinion, we refer to Sterling's arguments as those of Northwest.

## A. *The initial promissory note and the guaranty agreements*

In or about 2003, two companies, Oak Brook Financial Corporation (Oak Brook) and Emerald Development Co. (Emerald) formed a joint venture called Meridian Village No. 1, LLC (Meridian) to develop a condominium project in Beaverton. Meridian then sought and obtained a $200,000 line of credit with Sterling, which was reflected in a promissory note.

Meridian was the primary obligor on the note, and Sterling also obtained guaranties for repayment of the loan. In total, the Sterling loan was guarantied by 10 people or entities: Oak Brook and its members Steven Hanson and Thomas Shauklas (collectively, the Oak Brook defendants); Emerald and its members Arya Nasorllah Matin and Habib Matin (collectively, the Matin defendants); and Lili Mirtorabi, Jason Hossein Samani, Javad John Mirtorabi, and Mehdi Mirtorabi (collectively, the Mirtorabi defendants).

The coguarantors executed individual guaranty agreements in 2003. Each guaranty agreement contained the following provisions relevant to this appeal:

"**AMOUNT OF GUARANTY.** The amount of this Guaranty is Unlimited.

"**CONTINUING UNLIMITED GUARANTY.** For good and valuable consideration, [Guarantor] absolutely and unconditionally guarantees and promises to pay to Sterling Savings Bank ("Lender") or its order, * * * the Indebtedness (as that term is defined below) of MERIDIAN VILLAGE NO. 1, LLC ("Borrower") to Lender on the terms and conditions set forth in this Guaranty. Under this Guaranty, the liability of Guarantor is unlimited and the obligations of Guarantor are continuing.

"**INDEBTEDNESS GUARANTEED.** The Indebtedness guaranteed by this Guaranty includes any and all of Borrower's indebtedness to Lender and is used in the most comprehensive sense and means and includes any and all of Borrower's liabilities, obligations and debts to Lender, now existing or hereinafter incurred or created, including, without limitation, all loans, advances, interest, costs, debts, overdraft indebtedness, credit card indebtedness, lease

obligations, other obligations, and liabilities of Borrower, or any of them \* \* \*.

"**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender \* \* \* and will continue in full force until all Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. \* \* \* Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. \* \* \*

"**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender \* \* \* (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; \* \* \* (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

"**GUARANTOR'S WAIVERS.** \* \* \*

"\* \* \* \* \*

"Guarantor also waives any and all rights or defenses arising by reason of \* \* \* (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness."

B. *The Oak Brook defendants' $700,000 payment and the 2008 note*

Sterling extended the original line of credit to $1.7 million in 2004, and a new promissory note was created to reflect that extension. In April 2008, in an effort to renegotiate the terms of Sterling's loan to Meridian, the Oak Brook defendants proposed to make a payment of $700,000 on the loan in exchange for an indemnity agreement from their coguarantors and two related parties.[2]

---

[2] The indemnity agreement also provided that Parichehr Samani—Habib Matin's wife—and Emerald Engineers and Constructors, Inc. (not to be confused with Emerald Development Co.), who did not guaranty the Meridian loan, joined the indemnity agreement nonetheless, due to the benefit they would receive from the $700,000 paydown on the Meridian loan based on their association with Habib Matin and Emerald.

The indemnity agreement was executed in April 2008 and provided, in part:

> "On the condition that Group A [Oak Brook, Hanson, and Shauklas] makes the $700,000 paydown described above, the members of Group B [Emerald, Emerald Engineers and Constructors, Inc., Javad Mirtorabi, Giti Mirtorabi, Hossein (Jason) Samani, Lili Mirtorabi, Seid (Mahdi) Mirtorabi, and Habib Matin] hereby unconditionally, and jointly and severally within the group, agree to defend, indemnify and hold harmless the members of Group A from and against any claim made under their guarantees of the Loan or to otherwise collect the Loan from them. Each member of Group B further agrees that if Sterling Bank makes a demand on any member of Group A for payment of the Loan, the Group B members shall promptly, upon notice of the demand, pay the amount so demanded, directly to the bank. If the Group A member receiving the demand pays to Sterling Bank part or all of the demand, then the Group B members shall reimburse the Group A member who has made such payment, immediately upon demand.

> "Group A may pay the Loan on demand by the bank, without any obligation to contest in any way, or raise any defenses to payment of the Loan or under the guarantees."

In June 2008, the Oak Brook defendants made the $700,000 payment to reduce the amount owed on the line of credit. The payment brought the total amount owing on the Sterling loan to just over $1 million.

Concomitantly, Sterling and Meridian executed a new promissory note. The note provided that Meridian promised to pay Sterling the principal amount of $1,010,273.50, together with interest on the unpaid principal balance from June 9, 2008, until paid in full. That payment was due on July 5, 2009. The 2008 note provided that default would occur if, among other things, Meridian failed to make any payment due under the note. On appeal, the parties do not dispute that the guaranties that the coguarantors executed in 2003 applied to the 2008 note.

In March 2009, Sterling declared Meridian in default for failure to make the monthly interest payments required under the 2008 note. In June 2009, Sterling sent

Meridian a demand for payment of the entire unpaid principal balance and accrued interest under the note, but Meridian failed to make the payment. Sterling also sought payment from the coguarantors, who also failed to pay.

## C. *The litigation and partial settlement*

In July 2009, Sterling initiated this action in Washington County Circuit Court to collect full payment of the note, naming both Meridian and all of the coguarantors as defendants. Various defendants filed cross-claims.

After Sterling filed its action, the Oak Brook defendants initiated a separate action in September 2009 against the Matin and Mirtorabi defendants and the additional indemnitors to enforce the indemnity agreement. That action, filed in Multnomah County Circuit Court due to the forum-selection clause contained in the indemnity agreement, was stayed pending the outcome of the Washington County case.

In June 2010, Sterling filed a motion for summary judgment against all defendants. The trial court held a hearing on the motion on October 25, 2010. During the hearing, the Oak Brook defendants reported that they had reached a settlement agreement with Sterling, and Sterling notified the court that it was withdrawing its motion for summary judgment as to those three defendants.

The settlement documents between Sterling and the Oak Brook defendants had been executed several days before the October summary judgment hearing. The settlement agreement stated that it was between Sterling and Oak Brook, Hanson, and Shauklas—the Oak Brook defendants—as the "Settled Guarantors." The agreement provided that the Settled Guarantors, contemporaneously with the settlement agreement, would execute a judgment by confession in the amount of $800,000, including principal and interest, and that Sterling would not submit the judgment "except as set forth under the Statement Confessing Judgment (executed contemporaneously herewith) and the Covenant Not to Execute Judgment." Under a section entitled "Termination and Revocation of Personal Guaranties," the settlement agreement stated:

"Upon either entry of the Judgment by Confession, or return of the Judgment of Confession to the Settled Guarantors, any and all Personal Guaranties, Continuing Guaranties, Commercial Guaranties, or other guarantee executed by Settled Guarantors in favor of Sterling shall be forever terminated, revoked, null and void."

On the same day that Sterling settled with the Oak Brook defendants, Sterling executed a "Note Purchase and Sale Agreement" with Northwest in which Sterling agreed to sell, convey, and assign the 2008 note, a deed of trust, and the commercial guaranties to Northwest in exchange for $800,000. Northwest agreed to make two $400,000 payments within six months of the agreement.

Among the terms of the sale of the note, Sterling agreed to assign its right to attorney fees and costs and, upon payment of the $800,000 purchase price, to deliver to Northwest the judgment by confession that the Oak Brook defendants had signed:

"h. <u>Assignment of Litigation.</u> Sterling agrees to assign all its rights and interest including any claims for costs and/or attorney fees in the lawsuit currently filed in Circuit Court, Washington County, State of Oregon, Case No. C094420CV (the 'Litigation'). Settled Guarantors', as defined below, counsel shall prepare all necessary pleadings to effect such assignment. * * *

"j. <u>Judgment by Confession.</u> Upon receipt of full payment of the Purchase Price as specified in Paragraph 1 above, Seller shall deliver to Buyer the unrecorded original Judgment by Confession executed by Oak Brook Financial Corporation and Steven F. Hanson and Thomas C. Shauklas (collectively 'Settled Guarantors') pursuant to the Settlement Agreement between Seller and Settled Guarantors."

Attached as an exhibit to the sale agreement was an "Assignment and Assumption Agreement," which provided that Sterling, as assignor, "grants, sells, assigns and transfers" the 2008 promissory note to Northwest. Also included as exhibits were assignments of a deed of trust securing the 2008 note and assignments of the personal guaranties, including those of Oak Brook, Hanson, and Shauklas. The purchase and sale agreement and all of the assignment

agreements were signed on behalf of Northwest by Hanson, as its manager.

Despite having alerted the court at the October hearing that they had settled, neither the Oak Brook defendants nor Sterling informed the court that the 2008 note and guaranties had been sold and assigned to Northwest—a company managed by Hanson. On November 22, 2010, the trial court held a supplemental hearing on the summary judgment motion. At the hearing, the court orally granted summary judgment in favor of Sterling against Meridian, the Mirtorabi defendants, and the Matin defendants.

On November 24, Vial, the attorney for the Oak Brook defendants, sent a letter to Lemoine, the attorney for the Mirtorabi defendants, stating, in pertinent part:

> "This letter will confirm what I know your clients have already suspected, and that is that my clients [the Oak Brook defendants] have settled with Sterling Savings Bank and, in return, have taken an assignment of all claims against your clients. * * *

> "The purpose of this letter is to invite your clients to make a reasonable offer to settle this matter once and for all. With the original principal and interest, attorney fees, and other costs, the amount owing to Sterling (and now my clients) is well in excess of $1,233,000.00."[3]

Lemoine forwarded the letter to Reilly, the attorney for the Matin defendants, on or about November 29, 2010.

On November 26, 2010, Northwest sent a letter to the Mirtorabi defendants and the Matin defendants notifying them that

> "Northwest * * * has purchased from Sterling Savings Bank the Promissory Note executed on June 9, 2008 by Meridian Village #1, LLC in the initial principal amount of $1,010,273.50, which Note was personally guaranteed by each of the addressees above.

> "Northwest is now the 'Holder' of that Note, Sterling Bank having assigned to Northwest all of its rights under

---

[3] Despite Vial's representation in the letter that his clients, the Oak Brook defendants, had taken the assignment of the note, the trial court found that Northwest had taken the assignment, and that finding is supported by evidence in the record.

the Note and under the Washington County court judgment against the Defendants. Northwest intends to take aggressive steps to execute on the judgment and collect in full the amounts due from the Defendants under the judgment.

"As of November 30, the balance of the principal, accrued interest and late fees on the Note will be over $1,000,000 with post judgment interest accruing at the rate of about $7200 per month ($240/day). ***"

The letter was signed by Hanson and stated that he was a managing member of Northwest.

On December 13, 2010, the trial court signed an order granting Sterling's motion for summary judgment on its claims against Meridian, the Mirtorabi defendants, and the Matin defendants. And, on January 4, 2011, the court entered a limited judgment in favor of Sterling against Meridian, the Matin defendants, and the Mirtorabi defendants for over $861,000 and a significant amount of prejudgment interest, and it awarded fees and costs to Sterling. The judgment provided that Sterling was the judgment creditor. At Sterling's request, its claims against Arya Nasorllah Matin and the Oak Brook defendants were dismissed.

D. *The motion for relief from the judgment under ORCP 71*

With collection efforts underway, including the initiation of garnishments and the entry of orders allowing judgment debtor examinations, Habib Matin (Matin) and Emerald, the remaining Matin defendants, filed a motion for relief from the limited judgment under ORCP 71 in February 2011.[4] Matin and Emerald relied on a number of theories under ORCP 71, including ORCP 71 B(1)(a) (surprise or excusable neglect), ORCP 71 B(1)(b) (newly discovered evidence), ORCP 71 B(1)(e) (satisfaction), and ORCP 71 C (the court's inherent power to modify). The Mirtorabi defendants joined in the motion.

---

[4] The supplemental judgment awarding Sterling its attorney fees was entered later, in April 2011, and the parties then litigated the ORCP 71 motion with respect to both judgments. We recognize that our case law states that a supplemental judgment arising from a limited judgment but entered before entry of the general judgment is not valid. *See White v. Vogt*, 258 Or App 130, 144, 308 P3d 356 (2013).

According to Matin, Emerald, and the Mirtorabi defendants (collectively, the remaining coguarantors), they were entitled to relief from the judgment because newly discovered evidence demonstrated that Sterling had assigned the 2008 note and related guaranties to Northwest, a company that they believed was owned and managed by their coguarantors, Hanson and Shauklas. The remaining coguarantors argued that, if the note and guaranties were assigned to "what is in essence a co-guarantor of the Note sued upon herein, that payment should act as a satisfaction of the Note, and the assignee should have rights against the other co-guarantors only severally to the extent of their contributive shares." The remaining coguarantors also argued that the principle in *Jackman v. Jones*, 198 Or 564, 258 P2d 133 (1953)—that a debt reduced to judgment is extinguished when a judgment creditor's rights are assigned to a judgment debtor or to a stranger for the judgment debtor's benefit—should apply to the assignment of a joint and several debt, even when that assignment occurred before entry of a judgment. And, the remaining coguarantors argued that the court should disregard Northwest's status as a Washington limited liability company, because the Oak Brook defendants were using it as an alter ego or conduit to harm the other coguarantors in a manner that the Oak Brook defendants would not be allowed to do in their individual capacities as guarantors.

Sterling, through Northwest, defended the limited and supplemental judgments based on procedural objections under ORCP 71 and on that rule's various requirements. Sterling relied on the terms of the coguaranty agreements and the assertion that the transfer of the note had not effected a satisfaction of a judgment or of the debt. The parties briefed whether principles of suretyship and guaranty should limit the normal right of a holder of a promissory note to collect on the note and whether *Jackman* applied.

In connection with the remaining coguarantors' argument that *Jackman* applied, the parties also briefed whether Northwest was, in effect, a coguarantor who had satisfied the debt underlying the limited judgment. The remaining coguarantors contended that Northwest, whose

sole member was a company called Riverwoods Investments, LLC, (Riverwoods), was in fact the alter ego of Hanson.

In its order on the motion for relief from judgment, the trial court found, among other things, that Hanson had personally funded Northwest before Riverwoods acquired Northwest, that Hanson was Northwest's manager, and that Riverwoods could not remove Hanson as manager of Northwest. In its order, the trial court concluded, as a matter of law, that Northwest was Hanson's alter ego; that Hanson controlled Northwest; and that through Northwest, Hanson had arranged for the payment to Sterling and for the assignment of the note, guaranties, and judgments to Northwest.

The trial court granted the remaining coguarantors' motion for relief from the judgments. The court concluded that, when a judgment is assigned to a judgment debtor or to a stranger for the debtor's benefit, the assignment extinguishes the judgment because the "two antagonistic rights of creditor and debtor are thereby merged in one and the same person." The trial court concluded that that rule applies in situations in which there is an assignment of a note, guaranties, and a judgment to a debtor or to a stranger for his benefit even when the judgment has not yet been entered. Accordingly, the court concluded that both the note and Sterling's judgments had been "satisfied, released, or discharged" because Hanson, a debtor, through Northwest, had obtained Sterling's rights under the note and guaranties.

However, the court did not limit its relief for the remaining coguarantors to disallowing Northwest's recovery of any amount in excess of the amount that Northwest had paid for the 2008 promissory note. In the general judgment now on appeal, the court vacated the limited judgment as to the remaining coguarantors. It also vacated the supplemental judgment awarding attorney fees against the remaining coguarantors. And, the trial court dismissed with prejudice all claims against the six remaining coguarantors. That left intact the judgments for the debt and fees against Meridian, despite the trial court's conclusion that the debt and the judgments had been satisfied.

## II.  STANDARD OF REVIEW

Northwest timely appeals, challenging both the general judgment and the granting of the remaining coguarantors' motion for relief from the judgments. "We review a trial court's decision with respect to a motion to set aside a judgment for abuse of discretion. An incorrect application of the law is, by definition, an abuse of discretion." *Taylor v. Morrison*, 188 Or App 519, 524, 72 P3d 654 (2003) (internal citation omitted). As we explain below, the trial court improperly applied the law and abused its discretion in granting the remaining coguarantors' motion for relief from the judgments. As a result, it erred in entering the general judgment.

## III.  ANALYSIS

The trial court, relying on the merger principle announced in *Jackman*, concluded that the assignment of a debt to a debtor, or to a stranger for the debtor's benefit, extinguishes the debt because "the two antagonistic rights of creditor and debtor are thereby merged in one and the same person." Thus, regardless of the intent of the parties to the transaction, the court concluded that the debt owed to Sterling was extinguished when Northwest, which it concluded was acting on behalf of Hanson, a guarantor of the debt, received an assignment of the note and guaranties from Sterling. As mentioned above, we review that conclusion for legal error. If we conclude that the trial court incorrectly applied the law, then we must also conclude that it abused its discretion in granting the defendants' motion to set aside the judgments.

To state it another way, the primary legal issue presented is whether a debt is extinguished, as a matter of law, when the original creditor sells the promissory note to a coguarantor and assigns the creditor's rights under attendant guaranties or, instead, whether the purchasing coguarantor can maintain an action, as an assignee of the creditor, to enforce the guaranties against his coguarantors. It appears that this is a matter of first impression in Oregon. For the reasons below, we conclude that a coguarantor's purchase of a promissory note and guaranties, and a creditor's assignment of its rights under those instruments to the

coguarantor, does not extinguish the obligation. Instead, the coguarantor, as assignee of the creditor, can maintain an action to enforce the guaranty agreements against his or her coguarantors. However, equitable principles limit the guarantor-assignee's recovery against his or her coguarantors to their pro rata contributive share of what the purchasing-guarantor paid the creditor.

A.  *The effect of Northwest's purchase of the note and the assignments*

Northwest is correct that, under well-established Oregon law, an assignment is an immediate, unconditional transfer of rights held by the assignor to the assignee. *Springfield Int. Restaurant v. Sharley*, 44 Or App 133, 140, 605 P2d 1188 (1980) ("An 'assignment' of a right is a manifestation to another person by the owner of the right indicating his intention to transfer, without further action or manifestation of intention, the right to such other person or to a third person." (Some internal quotation marks omitted.)). As a result, "[a]n assignee stands in the shoes of his assignor" and acquires all of the legal rights that the assignor possessed. *State ex rel AFSD v. Lester*, 45 Or App 389, 392, 608 P2d 588 (1980).

In this case, Northwest purchased the 2008 note and guaranties from Sterling and obtained an assignment of Sterling's right, title, and interest in those instruments. Thus, under ordinary assignment principles, Northwest obtained all of Sterling's rights relating to those instruments, including the right to payment for the balance and interest on the note from Meridian, as well as a right to enforce the guarantors' agreements to pay the entire debt. However, Northwest's relationship with Hanson, one of the coguarantors of the note, has the potential to complicate what would otherwise have been a run-of-the-mill commercial transaction. We will address the trial court's findings and conclusions regarding Northwest's relationship to Hanson later in this opinion. For now, suffice it to say that, assuming that Northwest is a "guarantor" of the note, its status as such brings significant legal baggage to its transaction with Sterling—baggage that ultimately limits its recovery against the remaining coguarantors.

The reason that Northwest's potential status as a guarantor of the underlying obligation could affect its rights as an assignee of the note is because, under the law of suretyship and guaranty, a person's or entity's status as a guarantor triggers certain rights and duties with respect to other guarantors of the same underlying obligation. *Mansfield v. McReary*, 263 Or 41, 44, 497 P2d 654, *opinion modified on denial of reh'g*, 263 Or 41, 501 P2d 69 (1972) (explaining that, under the principles of suretyship and guaranty, when multiple guarantors promise to pay the same underlying obligation in separate guaranties they are each other's coguarantors). Among those rights and duties is the right to contribution. "As a general rule, when a guarantor pays more than his proportionate share of the common obligation, he is entitled to contribution from his coguarantors." *Id.*; *accord Guaranty*, 38 Am Jur 2d § 100 (2010) ("If a principal obligation is guaranteed by two or more persons, each must pay the proportional share of the liability, and a guarantor who has paid more than his or her share is entitled to contribution from the others and may sue to enforce that right." (Footnotes omitted.)). "The rule is based on the equitable principle that, where several are equally liable for the same debt and one is compelled to pay the whole, he or she may have contribution against the others to obtain the payment of their respective shares." 38A CJS *Guaranty* § 161 (2008).

As mentioned before, Oregon has yet to consider what legal effect a guarantor's purchase of a note and guaranties has on the underlying obligation. A survey of courts that have had an opportunity to consider that issue demonstrates that there are two, competing approaches to determining a guarantor's rights against his or her coguarantors when he or she has purchased a note and obtained an assignment of the underlying obligation and guaranties.

Under the first approach, some courts recognize the right of a guarantor to purchase the underlying note and assert a cause of action against the coguarantors as an assignee of the creditor. *See, e.g., Byrd v. Estate of Nelms*, 154 SW3d 149, 165 (Tex Ct App 2004) (holding that guarantor of note can purchase note and sue coguarantors as an assignee); *Albrecht v. Walter*, 1997 ND 238, ¶ 14, 572 NW2d 809, 813 (1997) (concluding that a coguarantor may

purchase an assignment of a note and the guaranties and sue coguarantors as assignee); *Estate of Frantz v. Page*, 426 NW2d 894, 898 (Minn Ct App 1988) (explaining that, due to terms of note and guaranties, which expressly permitted assignment, estate that received assignment of note and guaranties could choose, in its capacity as creditor-assignee, to proceed on the guaranties, or could choose, in its capacity as guarantor, to bring an action for contribution). Implicit in those cases is an acknowledgement that a guarantor's purchase of the underlying obligation does not, as a matter of law, extinguish the debt. Thus, the courts adopting that approach do not apply a merger rule to extinguish the debt when a guarantor becomes, in effect, the creditor by virtue of an assignment.

The courts that have adopted the first approach, however, have concluded that an assignee-guarantor's recovery against his or her coguarantors is nevertheless limited, as a matter of law, to the coguarantors' proportionate share of what the guarantor paid the creditor for the note. *See, e.g., Mandolfo v. Chudy*, 253 Neb 927, 931-32, 573 NW2d 135, 138-39 (1998) (explaining that the assignment of a promissory note and its guaranties to two guarantors of the note did not enhance their rights against their coguarantor; thus, though the purchasing guarantors could proceed against one of the coguarantors as creditors on the note, "the assignment does not alter their status as coguarantors of the note"; therefore, absent proof that one of the other coguarantors is insolvent, they cannot recover more than the coguarantor's pro rata share of the note); *see also Weitz v. Marram*, 34 Md App 115, 121, 366 A2d 86, 89 (1976) (holding that, in the guarantor's action as an assignee of the creditor against one of his coguarantors, the guarantor's undisputed relationship as a coguarantor "operates as a matter of law to restrict the right of" the guarantor to the recovery of no more than the defendant's contributory share of the obligation); *Albrecht*, 1997 ND at ¶ 14, 572 NW2d at 813 (concluding that "a coguarantor may purchase an assignment of a note and the guaranties, but the initial relationship as coguarantors will operate as a matter of law to restrict the recovery and will govern the rights of the coguarantors," and, accordingly, the guarantors in that case could only recover the coguarantor's

proportionate share of the debt that they had paid); *Byrd*, 154 SW3d at 165 (guarantor's purchase of note did not preclude him from suing coguarantors as assignee of creditor, but assignment of underlying note and guaranties did not change the status of the guarantor in relation to his coguarantors and limited his recovery to their contributive share).

Under the second approach, other courts have held that a guarantor may not sue on the note as an assignee of the creditor and that, in such a case, the guarantor can only recover from his or her coguarantors through a cause of action for contribution. *See, e.g., Koeniger v. Lentz*, 462 So 2d 228, 228-29 (La Ct App 1984) (holding that a guarantor who had paid the creditor and had been subrogated to the creditor's rights in the notes and guaranties had extinguished the debt and could not sue his coguarantors on the notes and was limited in his recovery to the proportionate share of each coguarantor).

Thus, under either approach, equitable principles grounded in the law of suretyship and guaranty operate to limit the recovery of one guarantor against his or her coguarantors to their pro rata share of the obligation. The difference in the approaches is whether the guarantor can obtain that remedy in his or her capacity as assignee of the creditor, stepping into the creditor's shoes in the action on the debt, or whether the guarantor, who has paid for the shared obligation, must file a separate action for contribution against the coguarantors.

We are persuaded by the first approach because it reflects the actual intent of the parties to the purchase and sale of a note. We hold that a guarantor's purchase of the underlying obligation—as opposed to a payment and cancellation of the debt—does not extinguish the debt as a matter of law and, therefore, the guarantor can proceed against its coguarantors as the creditor's assignee. The transaction between Northwest and Sterling, by all indications, was intended by the parties to be a purchase and assignment of the debt—not an extinguishment thereof. Even though principles of suretyship and guaranty, as a matter of law, would restrict a purchaser-guarantor's recovery against coguarantors to their pro rata shares of what the guarantor paid the

creditor, those principles should not operate to transform the transaction into a payment of the debt, in derogation of the intent of the parties to the transaction.[5]

B. *Merger principles should not apply, and* Jackman *is unpersuasive*

The remaining coguarantors recognize that there is a split of authority in other jurisdictions regarding whether a guarantor who acquires the underlying debt may pursue an action based on the debt or else must bring a separate action for contribution. But they urge us to adopt the second approach, arguing that the merger principle in *Jackman* weighs strongly in favor of a determination under Oregon law that a guarantor's purchase of a note extinguishes the underlying debt. We disagree.

The remaining coguarantors' invocation of *Jackman* is unpersuasive for a variety of reasons. The facts underlying that case are significantly distinct from the facts underlying this appeal, the legal principles relevant to that case are inapplicable here, and its underlying rule—that a release of one tortfeasor releases all—has been discredited. Additionally, the reasoning in *Schiffer v. United Grocers, Inc.*, 329 Or 86, 989 P2d 10 (1999), which gave due regard to contract law, also cuts against the remaining coguarantors' effort to extrapolate from *Jackman* a principle so generalized that it is elastic enough to apply here.

We begin by underscoring the narrowness of the actual issue in *Jackman* as well as the court's resolution of

---

[5] Northwest acknowledges that other jurisdictions have adopted the above principles to limit a guarantor's recovery against his coguarantors, but it argues that those principles do not apply in this case. Given the separate action concerning the indemnity agreement filed in Multnomah County Circuit Court, we do not reach its argument that, because the indemnity agreement between the coguarantors reflects an agreement on behalf of the Matin and Mirtorabi defendants to indemnify the Oak Brook defendants for the entire amount owing to Sterling, Northwest is not limited to the recovery of the remaining coguarantors' proportional share of the obligation. As for Northwest's two other arguments to avoid the equitable principle limiting recovery against coguarantors—(1) that the coguarantors agreed to waive all equitable defenses, including (according to Northwest) any right or defense to contribution among coguarantors and (2) that the guaranties were explicitly assignable—we are not persuaded by Northwest's abbreviated argument that those provisions of the guaranty agreements operate as Northwest asserts and overcome the equitable limitation on Northwest's recovery if it is to be treated like a coguarantor.

that issue. At the outset of that opinion, the *Jackman* court characterizes the question raised as "whether or not the plaintiff, by assigning a judgment which it obtained against one of the defendants, released its claim against the other two * * * joint tort-feasors." 198 Or at 565. The court subsequently reiterates that

> "the only question which we find it necessary to decide is whether the plaintiff, as the result of his assignment to Standard Accident Insurance Company of the judgment recovered by him against Jones, lost his right to proceed against Jacobson and Taggart in his action for damage to his truck and for loss of its use. The precise question is whether the legal effect of that transaction is an extinguishment of the judgment and so a release of Jones, a joint tort-feasor with the defendants."

*Id.* at 569-70. Elsewhere, the court clarifies that "the question before us * * * involve[s] the legal status of an insurance carrier with reference to a judgment which had already been recovered against its insured." *Id.* at 572.

The three cases that *Jackman* considered at any length in resolving those questions were equally limited in their scope. For example, *Lillie v. Dennert*, 232 F 104, 109 (6th Cir 1916), was focused on the purchase of a judgment by the agent of one of several joint tortfeasors:

> "If, however, the judgment was thus in fact bought by * * * one of the joint tort feasors and judgment debtors, this clearly operated as an entire discharge and satisfaction of the judgment, even although the purchase was ostensibly made by Lillie and the assignment taken in his name in the effort to keep the judgment alive * * *."

*See also Fiorentino v. Adkins*, 9 NJ Misc 446, 447-48, 154 A 429, 430 (1931) (explaining that the insurer of one joint tortfeasor could not, after paying the judgment and taking assignment from the plaintiff, recover from the other joint tortfeasor when there was no right to contribution between them); *Adams v. White Bus Line*, 184 Cal 710, 712, 195 P 389, 389 (1921) (in an action against joint tortfeasors, the insurer's "payment to the plaintiff was no more than the act of the insured * * *. The insurance company was not entitled to have the judgment kept alive, as it had no recourse against either of the defendants. The status of the parties is

the same as if the [insured] had itself advanced the amount of the judgment and taken an assignment from plaintiff on its own initiative.").

As the court explained in *Jackman*, those cases establish the principle "that an insurance carrier stands in the shoes of its insured and that in the application of the rule which denies contribution between joint tort-feasors there is no distinction between a joint tort-feasor and one who, by contractual undertaking, stands in his place." *Jackman*, 198 Or at 576 (internal quotation marks omitted). Based on that principle, the court in *Jackman* held that, given *both* the specific nature of the relationship between the insurance carrier and the insured defendant in that case, *and* the rule against contribution among joint tortfeasors, assignment of the default judgment by the plaintiff to one codefendant's insurer extinguished the judgment and released any claim that the plaintiff may otherwise have had against the remaining joint defendants. *Id.* at 576-78.

As is evident from the foregoing, *Jackman* is limited to the very particular context—factual, legal, and, to the extent that Oregon law no longer denies a right of contribution between joint tortfeasors, historical—in which it arose. None of the elements in *Jackman* are present in this case. *Jackman* involved the assignment of a judgment, but this case involves the assignment of a promissory note. The relationship between Northwest and the remaining coguarantors in this case is not the same as the one in *Jackman*. Nor is the relationship between Northwest and the Oak Brook defendants analogous to the relationship between the insurance company and its insured in *Jackman*.[6] Finally, an indispensable legal premise of the *Jackman* court's reasoning and ruling—namely, the prohibition on contribution among joint tortfeasors—long ago disappeared. In fact,

---

[6] In *Jackman*, and in the cases it relied on, the court based its holding in large part on the fact that the assignee insurer in each case was explicitly contractually bound to pay the debt owed by the judgment debtor. *See, e.g., Fiorentino*, 9 NJ Misc at 448, 154 A at 430 (noting that the insurer, "though not a party to the action, is nevertheless not a volunteer"; that by paying the amount of the judgment, it did "that which it was, by its contract obliged to do"; and that "one of the incidents of the contract subrogated the [insurer] to the rights of [its insured]" and the insurer "stands in its insured's shoes"). Here, Northwest did not guaranty the note, nor was it otherwise contractually obligated to pay the debt either on its own or on behalf of the Oak Brook defendants.

the Supreme Court explained that the changing of the rule that "a release of one tortfeasor releases all others" is "an excellent example of the history of a rule of law based on sterile and questionable logic, rather than reality." *Cranford v. McNiece*, 252 Or 446, 450, 450 P2d 529 (1969).

Notwithstanding those distinctions, the remaining coguarantors argue that it is appropriate to import the concept in *Jackman*—that a plaintiff's assignment of a judgment entered against several joint tortfeasors to one of those tortfeasors may be deemed to have extinguished the judgment—and to apply it to the circumstances here. However, there was no judgment when Sterling assigned its rights to Northwest, and, as Northwest correctly points out, "a judgment is a fundamentally different type of debt than a promissory note or commercial guaranty. The latter involves negotiated contracts defining the parties' rights and allocating risk. Judgments do not."

We also note that even the authority from which *Jackman* derives the general rule calling for merger of a judgment assigned to one of several joint defendants qualifies its application in the case of contrary intent:

"In 49 CJS 1026, Judgments, § 555, it is said:

'As a general rule, *in the absence of a statute to the contrary*, it is not competent for one of the joint defendants on paying the judgment to take an assignment of it to himself, or, unless under special circumstances, to a third person for his benefit, so as to wield it against his codefendant, and it is none the less extinguished by the payment, although such an assignment is made, *unless, according to some authorities, the payment was not intended to have that effect.*'"

198 Or at 570 (emphasis added). The remaining coguarantors ignore the intent of the parties with respect to the transfer of the promissory note and the assignment of the commercial guaranties. The reality is that the note was sold for a price: Northwest holds the note, and it was never cancelled.

The position taken by the remaining coguarantors also runs counter to specific contractual provisions of their

guaranties. The guaranty agreements reflected that each of the coguarantors "authorized" Sterling "to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner" that Sterling chose; and authorized Sterling "to sell, transfer, [or] assign" "all or any part of the Indebtedness"; and "to assign or transfer" the guaranty agreement "in whole or in part." Moreover, each coguarantor agreed that the "[r]elease of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty."

It is telling that neither this court nor the Supreme Court has ever applied the merger principle articulated in *Jackman* in the over half a century since the case was decided. That is so even with regard to a plaintiff's assignment of a judgment to one of several joint tortfeasors, much less to the different context allegedly presented in this case: one coguarantor's purchase of the debt for which the coguarantors are jointly liable. *See Mansfield*, 263 Or at 44 (no *Jackman* merger principle raised in a case in which one coguarantor paid one of the corporate debtor's loans and assigned his rights to another coguarantor, his wife, who paid the remaining balance of the corporate debt and then sought contribution from all coguarantors).

The remaining coguarantors argue that *Jackman* is bolstered by the application of merger in the context of mortgages, citing *Baxter v. Redevco, Inc.*, 279 Or 117, 566 P2d 501 (1977). They contend that the "basic scenario" of rights of creditor and debtor merging in the mortgage context in *Baxter* is the same one at play in this case, with Northwest, on behalf of the Oak Brook defendants, buying the note and thereby "merging the right to payment with the obligation to pay, and extinguishing the debt in the process." Although *Baxter* is more analogous to this case than is *Jackman*, we conclude that merger in the mortgage context cannot be simply transported so as to control the outcome in this case.

The primary reason *Baxter* does not apply here is the rationale for merger in the mortgage context. That rationale is to prevent the purchaser of property subject to a mortgage—who has already received the benefit of a

reduction in the purchase price on account of the amount of the mortgage on the property—from receiving a windfall by purchasing the debt that gave rise to the mortgage and thereby recovering the same amount from the mortgagor or seller. The court in *Baxter*, quoting a treatise on mortgages, explained the general rule that, when a grantee has taken property subject to a mortgage and without assuming its payment,

> "'although the grantee incurred no personal obligation to pay off the mortgage, nonetheless when he bought the land subject to it, his bargain included as part of the price the amount of the mortgage debt. As a consequence, even though the mortgagor could not compel him to pay and the mortgage creditor has no right against him personally, yet it is so far his duty to discharge the debt that if he does so he should have no recourse against the mortgagor for reimbursement. It would seem, therefore, that regardless of the value of the land, when a grantee subject to the mortgage buys in the mortgage, he cannot enforce any right on it against the mortgagor.'"

279 Or at 123-24 (emphasis omitted). The court noted, however, that, even in that context, the general rule "is limited by the intent of the parties." *Id.* at 122; *see also Lothstein v. Fitzpatrick*, 171 Or 648, 660, 138 P2d 919 (1943) ("The general rule is that the doctrine of merger applies where the title to a mortgage and title to the mortgaged property become united in the same person. An extinguishment of the mortgage indebtedness will be presumed unless a contrary intention appears."); *Smith v. Allen*, 144 Or 261, 266, 24 P2d 1043 (1933) ("Whether a merger exists depends upon the intention of the parties. Where it is for the best interests of the mortgagee not to merge legal and equitable titles, it may refrain from so doing." (Internal quotation marks omitted.)). The *Baxter* court observed that the facts of the case met the rationale for application of merger, noting that the plaintiff's bargain for purchase of the property subject to the mortgage "included as part of the price the amount of the note and the second trust deed." 279 Or at 124.

That equitable rationale for merger in the mortgage context is inapposite to the dispute here. The coguarantors

have not already given value to Northwest or to the Oak Brook defendants in a way similar to that of a mortgagor when selling the property at a discount on account of the mortgage on the property. It cannot be said that either Northwest or the Oak Brook defendants are "double-dipping" to gain a windfall by going to the coguarantors twice and getting the same amount from them each time. In fact, it is the remaining coguarantors who argue for a windfall. On appeal, they contend that Northwest is in effect a coguarantor for purposes of their merger argument while at the same time arguing that Northwest, because it was not actually a coguarantor, has no right of contribution against them, which would enable them to avoid any liability as coguarantors.

Although neither party cited it, we believe that the Supreme Court's decision in *Schiffer* ought to inform our resolution of the question whether *Jackman* can or should apply in this case. In *Schiffer*, two co-obligors on a note brought an action against the defendant obligee after it had settled with and released the third co-obligor, Gast, from any obligation to the defendant on the note. The co-obligors sought a declaration that the release of Gast had, as a matter of law, discharged their debt to the defendant. 329 Or at 90. The Supreme Court abrogated the common-law "release of one releases all" rule in contract, stating that "we today hold that the release of one joint and several contract obligor does not release automatically the other joint and several obligors" and instead that "the release must be given effect according to the intentions of the parties to that release." *Id.* at 100. The court explained that it did so because the new rule offered advantages over the old one that it abrograted, including that the new rule was aligned with case law that a release is a contract, and thus harmonized rules for interpretation of releases of joint and several contract obligors with rules for interpretation of releases and other contracts generally. *Id.* at 101. A similar rationale applies in this case to the rejection of a merger principle, whether derived from *Jackman* or elsewhere, that would disregard the effect of the contracts relevant to the transaction in which Sterling transferred the promissory note to Northwest and the terms of the guaranty agreements.

In sum, we reject defendants' invitation to apply a principle of merger as a matter of common law—in substance, a legal fiction—to vitiate the debt evidenced by the promissory note here. Instead, as limited by the equitable principle found in the law of suretyship and guaranty that bars one coguarantor from gaining a financial advantage over other coguarantors, the parties' agreements and contract law control the parties' rights and obligations.

## C. *Northwest's status as a coguarantor*

Because the equitable limitation on a guarantor's recovery from coguarantors will only apply and limit Northwest's recovery against the remaining coguarantors if Northwest is a guarantor, we turn to the trial court's determination that Northwest should be treated as if it were Hanson, a guarantor of the debt. It is beyond dispute that Northwest never agreed to guaranty the 2008 note. However, if Northwest is deemed a guarantor, its recovery from the remaining coguarantors will be limited, as a matter of law, to their pro rata contributive share of what Northwest paid for the note. If, on the other hand, Northwest is an independent third party, the normal rules regarding assignments would apply, and it would be entitled to enforce Sterling's full set of rights against the remaining coguarantors.

In the trial court, the remaining coguarantors argued that Northwest should be treated like a guarantor. In their motion for relief from the judgments, Matin, Emerald, and the Mirtorabi defendants asserted that Northwest's payment to Sterling and the assignments of the note and guaranties

> "should act as a satisfaction of the Note, and the assignee should have rights against the other co-guarantors only severally to the extent of their contributive shares. In the alternative, if the court does not find that the assignee should be limited to seeking each co-guarantor's contributive share individually, the court should offset the amount due under the Note by the amount paid for it."

In their memorandum of law, they argued that under "the law of guaranty and suretyship," the trial court "should

modify the judgment \* \* \* by granting the Oak Brook defendants judgment" against each of them "severally for one-ninth of the amount Oak Brook paid to Sterling for the Note, rather than jointly and severally for the entire face value thereof." Thus, the remaining coguarantors moved, not to avoid liability entirely, but to limit their liability in accordance with the equitable limitation on recovery applicable to a coguarantor. The remaining coguarantors argued that the court should disregard Northwest's role based on either of two theories: (1) "piercing the corporate veil" because "the Oak Brook defendants are using [Northwest] as an alter ego or conduit to harm the other guarantors in a way that the Oak Brook defendants would not be allowed to individually under the equitable rules" that apply when a coguarantor acquires the note or (2) the Oak Brook defendants had "breached the implied covenant of good faith and fair dealing implicit in their agreement with the other guarantors to share the burden of the debt."

In its order on the motion, the trial court made the following findings regarding Northwest's relationship to Hanson:

- Northwest was funded solely by Hanson with approximately $3 million dollars of his personal assets.

- At the time Northwest was funded, Hanson was its sole member and owner, and Northwest "is effectively Steven Hanson's alter ego."

- In July 2010, Hanson contributed Northwest to Riverwoods in exchange for a 22.38% membership interest in that entity.

- Hanson's funding of Northwest "predated the sale to Riverwoods."

- Today, Riverwoods is the sole owner of Northwest.

- Northwest's operating agreement provides that Riverwoods cannot remove Hanson as a manager of Northwest and that the operating agreement cannot be amended without Hanson's consent. Also under that agreement, if Hanson dies, becomes

incapacitated, or is unable to act as Northwest's manager, his estate or designee becomes manager of Northwest.

- And, at all material times, Hanson was responsible for the management of the business of Northwest.

The court then drew the following conclusions regarding that relationship:

"3. Hanson was a co-guarantor of the Note and a co-defendant in the litigation eventually resulting in the Judgment. Hanson also controlled [Northwest] and through [Northwest], paid funds for the assignment of the Note, Guaranties, and Judgment. He controlled all of it.

"4. [Hanson] as co-guarantor and co-defendant, directly or through his control over [Northwest], paid money to Sterling Savings Bank which in turn then assigned its rights under the Note, the Guaranties of Mr. Hanson's co-guarantors and co-defendants, and any resulting Judgment to Hanson and/or [Northwest]. [Northwest] is Steve Hanson's alter ego. The Note and any Judgment resulting or based thereupon have thus been satisfied, released, or discharged."

Thus, the trial court's order indicated that it had accepted that Northwest should be treated like a coguarantor based on its acting as Hanson's "alter ego," which could suggest that the trial court was relying on the piercing theory advanced by the remaining coguarantors. *See Amfac Foods v. Int'l Systems*, 294 Or 94, 105, 654 P2d 1092 (1982) (noting the Supreme Court's older cases relying on the rule that the corporate veil may be pierced "if the corporation is a mere 'instrumentality' or 'alter ego' and where fraud or injustice has resulted"). However, when making its oral ruling, the trial court had clarified that it was not relying on principles of veil piercing to conclude that the debt had been extinguished when Northwest purchased the note and specifically stated that Hanson's conduct was not fraudulent:

"Mr. Hanson is a co-debtor and a co-guarantor who has been controlling all of this. *I don't think it's fraudulent*, I just think that's what happened, and I therefore rightly or wrongly conclude that *under the law advance[d] by the*

*moving parties* that, well, one thing that Mr. Ross said today was *the creditor and debtor [merged].*

"The co-guarantor has satisfied the debt to Sterling Savings Bank, and under Oregon law that means the people are not liable to Sterling Savings Bank.

"\* \* \* \* \*

"[MATIN DEFENDANTS' ATTORNEY]:   And I'll ask one additional question which the Court may also decline to answer, but I'm interested in, for the record, understanding did the Court essentially find by observing that Mr. Hanson controls Northwest Lending, that in fact there has been a successful piercing of that corporate veil by \* \* \*

"THE COURT:   *I didn't rely on that theory. I'm relying on this co-guarantor, co-surety line of argumentation.*"

(Emphasis added.) Similarly, during the hearing on the form of the order, the court explained that its determination that Northwest was Hanson's alter ego was not intended to be a ruling on piercing; rather, it was "a factual finding." Nor did the trial court rely on the remaining coguarantors' theory of breach of the implied duty of good faith and fair dealing or identify any alternative legal theory, such as agency, that Northwest should be treated as if it were Hanson.

Thus, it appears that the trial court concluded that the merger principle in *Jackman* should apply because, similar to what had occurred between the insurer and insured in that case, Northwest had acted on Hanson's behalf. Although the remaining coguarantors continue to urge on appeal that *Jackman* supplies a basis for affirmance, as explained above, the court's reliance on *Jackman* was legally erroneous.[7]

---

[7] Relying on *Jackman* and a New York case, *Mediclaim, Inc. v. Groothuis,* 38 AD3d 730, 834 NY Supp 2d 200 (2007), the remaining coguarantors argue that, when a third-party purchaser buys a note on behalf of a coguarantor, regardless of whether the purchaser is a business entity or an individual, the purchaser must be treated as a coguarantor. In *Mediclaim,* unlike in this case, the defendant coguarantors proved that the real purchaser of a mortgage note was a coguarantor who had furnished all of the money that the purchaser had used to acquire the note. 38 AD3d at 731, 834 NY Supp 2d at 201. Here, there were no findings, or evidence, tracing funds from Hanson to Sterling. The trial court's findings were that Northwest had initially been funded solely by Hanson with $3 million dollars of his personal assets; that, at the time of funding, Hanson was the sole member and owner of Northwest; that later, in

The parties assert that the trial court's ruling also appears to be based on a piercing theory, although, as noted, whether that is so is unclear given the record. Assuming, however, that the trial court relied on a piercing theory, the parties disagree regarding the adequacy of that ruling.

In light of Northwest's status as a Washington limited liability company and a separate entity preexisting its purchase of the note, Northwest contends that its status can be disregarded and its actions attributed to its manager, Hanson, only if the coguarantors establish grounds for veil piercing. Northwest contends that any veil-piercing ruling was erroneous given that the court's order did not include any finding that Hanson had engaged in fraudulent or unjust conduct; in fact, the court's oral ruling was that Hanson's conduct was *not* fraudulent. *See Amfac Foods*, 294 Or at 107 ("Where actual exercise of control is shown to exist, improper conduct must also be demonstrated."). The remaining coguarantors argue that, despite the absence of an express finding in the order, the trial court must have implicitly concluded that veil piercing applied because Hanson was using Northwest "to bring about inequity," which they had specifically argued in support of their piercing theory in their motion for relief from the judgment.

Although Northwest invites us to decide whether a piercing theory is the exclusive means to establish that a company's purchase of a note can be treated as the act of its manager, a coguarantor, we need not and do not decide that issue and instead focus on the legal theories before us on appeal. If the court ruled on any legal theory advanced by the remaining coguarantors besides the merger theory in *Jackman*, that theory is piercing. The remaining

---

July 2010, Hanson had contributed Northwest to Riverwoods in exchange for a 22.38% membership interest; and that Riverwoods is currently the sole owner of Northwest. The court also found that the "Settlement Agreement and the Release of Hanson, Shauklas and Oak Brook were premised and conditioned upon payment, ostensibly by [Northwest], of $800,000.00, which payment was arranged and approved by Hanson." The conclusions that the trial court drew from the facts were that Hanson, "through [Northwest], paid funds for the assignment of the Note, Guaranties, and Judgment" and also that "Hanson, as co-guarantor and co-defendant, directly or through his control over [Northwest], paid money to Sterling Savings Bank." However, there is no evidence in the record that the money Sterling received for the assignment was Hanson's or that the money came directly from Hanson.

coguarantors do not urge on appeal any other ground for affirmance. Thus, we turn to the question whether there was any ruling on piercing that can be affirmed on the record before us.

We have attempted to construe the trial court's ruling as one on piercing and conclude that we cannot fairly do so. Were there such a ruling, at least under Oregon law,[8] the trial court's findings would not support a veil-piercing theory. In Oregon, the doctrine of corporate veil piercing applies to LLCs in the same way that it does to corporations. *See, e.g., Handam v. Wilsonville Holiday Partners, LLC*, 221 Or App 493, 496-97, 190 P3d 480 (2008) (applying veil-piercing rules in context of LLC). The trial court found that Northwest was Hanson's alter ego—that is, that Hanson controlled Northwest's actions. As the Supreme Court emphasized in *Amfac Foods*, though, the mere fact of Hanson's control of Northwest would be insufficient to support veil piercing. 294 Or at 107 ("Nor is the control of the corporation by a shareholder, in and of itself, sufficient to support a claim for recovery that the shareholder's immunity should be disregarded.").

Instead, we understand the trial court to have relied erroneously on *Jackman* to disregard Northwest's separate status as a Washington limited liability company. We therefore remand for the trial court to determine whether Northwest's separate status as a Washington limited liability company can be disregarded so that its purchase of the promissory note can be considered to be the act of its manager, Hanson. If Northwest's veil can be pierced, its recovery on the note against the remaining coguarantors would be limited to their contributive share of what Northwest paid for the note, and partial relief under ORCP 71 B(1)(e) based on that limitation can be provided through an appropriate judgment.[9] If, on the other hand, Northwest's veil cannot be

---

[8] The parties have not briefed the significance of Northwest's formation in Washington.

[9] We note that Northwest does not argue that a party cannot seek partial relief from a judgment under ORCP 71 B(1)(e), and, in fact, it asks us, if we decline to restore the limited and supplemental judgments in this case, to remand (as we are doing) to the trial court for further proceedings to properly analyze whether it is appropriate to pierce Northwest's corporate veil. Though apparently not considered directly by Oregon courts, see, for example, *Tenbusch*

pierced, Northwest, as a third-party assignee of the creditor, can enforce the note and the guaranties to the same extent that Sterling could have.[10]

## VI.   CONCLUSION

In sum, the trial court erred in granting the remaining coguarantors' motion to set aside the judgments in this case under ORCP 71 B(1)(e) on the basis that the judgments had been "satisfied, released, or discharged." The debt was not extinguished when Northwest purchased the note and guaranties from Sterling. Because the trial court relied on *Jackman*, we reverse and remand for further proceedings to determine whether this is an appropriate case in which to pierce Northwest's veil.

Reversed and remanded.

**DUNCAN, J.,** dissenting.

The trial court found that Northwest acted on behalf of Hanson and the Oak Brook defendants. That finding is supported by evidence. As detailed in the majority's opinion, the trial court found that Hanson controlled Northwest; indeed, it found that Northwest was "effectively Steven Hanson's alter ego." 266 Or App at 337-38. The trial court also determined that,

> "as co-guarantor and co-defendant, [Hanson] directly or through his control over [Northwest], paid money to Sterling Savings Bank which in turn then assigned its rights under the Note, the Guaranties of Mr. Hanson's co-guarantors

---

*v. Linn County*, 172 Or App 172, 179-80, 18 P3d 419, *rev den*, 332 Or 305 (2001) (assuming, without deciding, that ORCP 71 "provides a procedural vehicle" for a county's challenge to the amount of a judgment in a tort case in which the county sought to have the judgment amended to reflect a reduction in the judgment), federal courts applying FRCP 60(b)(5)—the federal counterpart to ORCP 71 B(1)(e)—have recognized that that rule provides relief from a judgment that has been satisfied, released, or discharged, in whole or in part. *See e.g., Torres-Troche v. Municipality of Yauco*, 873 F2d 499, 501, 501 n 7 (1st Cir 1989) ("The Rule should not be interpreted so strictly that it forecloses a litigant from alerting a court to the prior satisfaction of a final judgment.").

[10] Our decision does not take into effect any binding indemnity agreement among the coguarantors, which is yet to be litigated in the action in Multnomah County that is currently stayed. We also express no opinion regarding any right of contribution that the remaining coguarantors may have against coguarantors Hanson, Shauklas, and Oak Brook in the event that the remaining coguarantors pay more than their pro rata share of the debt.

and co-defendants, and any resulting Judgment, to Hanson and/or [Northwest]. [Northwest] is Steve Hanson's alter ego. The Note and any Judgment resulting or based thereupon have thus been satisfied, released, or discharged."

Thus, the trial court concluded that, when purchasing the assignment of Sterling's rights, Northwest was acting as a coguarantor or, at least, on the behalf of a coguarantor. That conclusion is supported by the record as well. As the majority describes, Sterling entered into a settlement agreement with the Oak Brook defendants, in which Sterling released the Oak Brook defendants from liability on the note, and the Oak Brook defendants agreed to execute a judgment by confession in the amount of $800,000, which Sterling would not submit except under certain prescribed conditions. 266 Or App at 318-19. On the same day, Sterling executed an agreement with Northwest, in which Sterling agreed to sell, convey, and assign the 2008 promissory note, a deed of trust, and the commercial guaranties to Northwest for $800,000; and, upon payment of that amount, Sterling would deliver to Northwest the Oak Brook defendants' judgment by confession. 266 Or App at 319. Based on that and other evidence, the trial court treated Northwest as a coguarantor, or at least an entity acting on behalf of a coguarantor.

As the majority notes, there are two competing approaches to determining a coguarantor's rights against his or her coguarantors when he or she has purchased a note and obtained an assignment of the underlying obligations and guaranties. 266 Or App at 326-28. The majority employs the first, under which a coguarantor who purchases a note can assert a cause of action against his or her coguarantors to collect on the note, although the collection may be limited by equitable principles. The trial court employed the second, under which purchase of a note by a coguarantor extinguishes the note, and the purchaser can only recover from his or her coguarantors through a cause of action for contribution.

In doing so, the trial court reasoned that, when "the two antagonistic rights of creditor and debtor" are merged in one and the same person, the debt is extinguished. The court relied on *Jackman v. Jones et al.*, 198 Or 564, 258 P2d 133 (1953). In *Jackman*, the Supreme Court cited, among

other cases, *Lillie v. Dennert*, 232 F 104, 109 (6th Cir 1916). In *Lillie*, the original plaintiff, Horrie, obtained a judgment against the defendants and joint tortfeasors Daggett and Dennert. 232 F at 105. At that time, joint tortfeasors did not have a right of contribution against one another. *Id.* at 108. After Horrie notified Daggett that he was about to obtain an execution on the judgment, Daggett offered to pay Horrie one-half of the judgment if Horrie would agree to collect the other half from Dennert. *Id.* at 107. Horrie declined the offer, but stated that, in order to assist Daggett, he would be willing to assign the entire judgment to a third party. At that point, Daggett prevailed upon Lillie, a friend and business associate, to purchase and take an assignment of the judgment from Horrie. Daggett and Lillie went to Daggett's bank and arranged for a loan to Lillie for the full amount of the judgment. Daggett also deposited a certificate of deposit for one-half of the amount as security for the loan. When the loan matured, Daggett paid the interest. *Id.*

Lillie applied for an execution and garnishment against Dennert, which the court granted. *Id.* at 105. In response, Dennert filed a petition alleging that, although Lillie purported to have paid Horrie, the payment had actually been made by Daggett, and, thus, the judgment should have been extinguished. Lillie filed an answer denying Dennert's allegations. The trial court entered an order that the judgment was fully paid and satisfied as of the date of the assignment to Lillie. The court also recalled the execution and dismissed the garnishment proceedings. *Id.*

Lillie appealed, and the Sixth Circuit affirmed. The Sixth Circuit held that evidence in the record supported the trial court's conclusion that the judgment was discharged when Lillie purchased and took an assignment of it from Horrie:

> "It is not disputed that if the judgment was in fact paid by Daggett, one of the joint tort feasors and judgment debtors, this operated as a satisfaction and discharge of the judgment. * * *
>
> "* * * [U]nder the undisputed evidence, there was ample room for an inference of fact that while the entire loan in the bank was ostensibly made in Lillie's name, and the note, as

between himself and the bank, constituted his individual debt, yet, as between Lillie and Daggett, the entire transaction amounted, in substance and in effect, to the borrowing of the money by Lillie as the agent for Daggett, as an undisclosed principal, the entire note constituting, as between them, Daggett's obligation rather than Lillie's; that the judgment having been purchased with the proceeds of this note was, in substance and effect, bought by Daggett, acting by indirection, through the instrumentality of Lillie; in short, that Lillie acted in the entire transaction merely as a man of straw for and in behalf of Daggett, as the real actor."

*Id.* at 108. Thus, the Sixth Circuit concluded that (1) if Daggett had paid the judgment directly, the judgment would have been satisfied and discharged, (2) Lillie was merely a "man of straw for and in behalf of Daggett, as the real actor[,]" and therefore (3) when Lillie purchased and took an assignment of the judgment, it was satisfied and discharged as if Daggett himself had purchased and taken an assignment of it. *Id.* at 109. As the *Jackman* court put it, "in substance and effect the judgment was bought by Daggett." 198 Or at 571.

I believe that the trial court found that what happened in this case is akin to what happened in *Lillie.* Like the putative purchaser in *Lillie,* Northwest was a straw man. Northwest, controlled by Hanson and acting for his benefit, seeks to collect the face value on the note, which Hanson, if he had acted on his own, could not do because he would be limited to collecting pro rata contributive shares from his coguarantors. Through Northwest, Hanson is using his purchase of the note as a sword against the other coguarantors, which the law disfavors, and which the merger doctrine protects against. I would affirm the trial court's use of that doctrine.

Haselton, C. J., and Wollheim, J., join in this dissent.